Adam M. Apton (State Bar No. 316506)
Email: aapton@zlk.com
**LEVI & KORSINSKY, LLP**
445 South Figueroa Street, 31st Floor
Los Angeles, CA 90071
Telephone: (213) 985-7290
Facsimile: (212) 363-7171

Counsel for Plaintiff Patrick Ayers

[*Additional Counsel listed on signature block.*]

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| PATRICK AYERS, Derivatively on Behalf of XPONENTIAL FITNESS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> ANTHONY GEISLER, JAIR CLARKE, MARK GRABOWSKI, CHELSEA A. GRAYSON, BRENDA MORRIS, and JOHN MELOUN, <br><br> Individual Defendants, <br><br> -and- <br><br> XPONENTIAL FITNESS, INC., <br><br> Nominal Defendant. | Case No. 2:24-cv-3937 <br><br> **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** <br><br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff Patrick Ayers ("Plaintiff"), by his attorneys, derivatively on behalf of Nominal Defendant Xponential Fitness, Inc. ("Xponential" or the "Company") submits this Verified Stockholder Derivative Complaint against individual defendants Anthony Geisler, Jair Clarke, Mark Grabowski, Chelsea A. Grayson, Brenda Morris, and John Meloun (collectively, the "Individual Defendants") for their breaches of fiduciary duty as directors and/or officers of Xponential, unjust enrichment, and violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff alleges the following upon information and belief, except as to the allegations specifically pertaining to Plaintiff, which are based on personal knowledge. This complaint is also based on the investigation of Plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE AND SUMMARY OF THE ACTION

1.    This is a stockholder derivative action brought by Plaintiff on behalf of Nominal Defendant Xponential against members of its board of directors (the "Board") and members of upper management. The wrongdoing alleged herein has caused substantial damage to Xponential's reputation, goodwill, and standing in the business community and has exposed Xponential to substantial potential liability for violations of federal securities laws and the costs associated with defending itself. The violations of the law outlined herein have damaged Xponential in the form of, among other things, millions of dollars in losses to the Company's market capitalization. This action seeks to remedy wrongdoing committed by Xponential's directors and officers from July 26, 2021, through the present (the "**Relevant Period**").

2.    Xponential claims to be the largest global franchisor of boutique fitness brands, with a platform offering ten brands in categories that include Pilates, indoor cycling, barre, stretching, rowing, dancing, boxing, running, functional training, and yoga. By the end of 2022, Xponential had over 1,700 franchisees and licenses for more than 1,900 studios contractually obligated to be opened under existing franchise agreements in North America.

3.    According to the Company's SEC filings, its portfolio brands include: (1) Club Pilates, the largest Pilates brand in the United States; (2) CycleBar, the largest indoor cycling brand in the United

States; (3) StretchLab, a concept offering one-on-one and group stretching services; (4) Row House, the largest franchised indoor rowing brand in the United States; (5) AKT, a dance-based cardio workout combining toning, interval, and circuit training; (6) YogaSix, the largest franchised yoga brand in the United States; (7) Pure Barre, a total body workout that uses the ballet barre to perform small isometric movements, and the largest barre brand in the United States; (8) Stride, a treadmill-based cardio and strength training concept; (9) Rumble, a boxing-inspired full-body workout; and (10) Body Fit Training, a functional training and strength-based program.

4.    The Company is involved with the operations of its franchises at each step of the process, from selecting franchise partners to providing continuing support as franchisees operate. The Company chooses franchise partners through a rigorous vetting and selection process. After a franchise is operational, the Company provides its franchisees with significant ongoing support through its "Xponential Playbook," with the objective of maximizing studio-level productivity and profitability, as well as ensuring and maintaining consistent operations in its studios nationwide. Franchisees are also incorporated into the Company's corporate platform, allowing them to leverage integrated systems and shared services. Almost all of the Company's franchise support services are integrated into the corporate levels of Xponential, except for marketing and fitness programming, which are specific to each brand.

5.    The Company's franchise agreements have an initial 10-year term. These contracts permit the Company to terminate the agreement if a franchisee is in default, has failed to meet minimum monthly gross revenue quotas, or has failed to select a suitable studio site within a certain time period.

6.    The Company expects its franchisees to meet and maintain minimum monthly gross revenue quotas by the end of the first and second year of their studio opening. If a franchisee fails to meet these quotas for 36 consecutive months at any point during the term of the contract, the Company can require the completion of corrective training programs or end the agreement in its entirety. From the Company's inception to December 31, 2022, approximately 600 of the Company's sold licenses in North America had been terminated and over 30 had been terminated globally.

7.    The Company's revenues primarily stem from franchise licenses and franchise related equipment, merchandise sales, and franchise training revenue. Xponential also takes in on-demand revenue, service revenue, and other revenue.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

8.      The Company maintains that it does not record sales by franchisees as revenue and that such sales are not included in its consolidated financial statements. Instead of providing these important figures, the Company provides investors with a number of key performance indicators used by its management, which are reportedly critical to evaluating the Company's performance. These key performance indicators include sales by franchisees that are not realized as revenue in the Company's financial statements. They are measured by same-store sales ("**SSS**") and average unit volume ("**AUV**").

9.      The Company states that SSS reflects the change in period-over-period sales for its North America same-store base (defined as only sales from studios in North America that have been open for at least 13 calendar months as of the measurement date). It calculates AUV by dividing sales during the applicable period for all studios being measured by the number of studios being measured. AUV growth is driven by changes in SSS and is also influenced by new studio openings. The Individual Defendants use AUV to evaluate studio economics.

10.     The truth about the Company began to emerge on June 26, 2023, when Fuzzy Panda Research ("**Fuzzy Panda**") published a research report titled "*Xponential Fitness (XPOF) – 'Abusive Franchisor That Is A House Of Cards'*" (the "**Fuzzy Panda Report**").

11.     The Fuzzy Panda Report alleged, among other things, that Defendant Geisler had a long history of misleading investors, including being exposed on camera for using "boiler room" tactics to mislead investors in connection with a prior venture and issuing false claims that Xponential "never closed a store." Moreover, the Fuzzy Panda Report revealed that its examination of 64 Franchise Disclosure Documents demonstrated that eight of 10 Xponential brands are losing money monthly and that more than 50% of its studios never make a positive financial return. The Fuzzy Panda Report also revealed that more than 100 of Xponential's franchises were for sale at a price 75% less than their initial cost and that the SSS and AUV the Company reports to investors selectively and misleadingly exclude underperforming stores.

12.     Following the publication of the Fuzzy Panda Report, the price of Xponential common stock declined by $9.39 per share – more than 37% –to close at $15.72 per share on June 27, 2023, on heavy trading volume.

13.     On December 7, 2023, the truth fully emerged when Bloomberg Businessweek ("**Businessweek**") released an exposé on Xponential that largely corroborated the Fuzzy Panda Report's

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

allegations. The exposé, titled "*Club Pilates, Pure Barre Owners Say Xponential Left Them Bankrupt*," stated that Businessweek had interviewed many former business partners, employees, and franchises of the Company who revealed that Xponential misled and misguided many franchisees into a "financial nightmare." The article also supported the Fuzzy Panda Report's claims that Defendant Geisler "has a track record of combative management, deploying growth-at-all-costs tactics and unleashing aggressive reprisals against anyone who gets in his way." It also stated that these tactics had caused "many of the company's franchises . . . [to] have either declared bankruptcy or los[e] their retirement savings."

14. Following the publication of the Businessweek article, the price of the Company's common stock fell more than 26% over two trading days, to close at less than $9 per share on December 11, 2023, on heavy trading volume.

15. During the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to make to the investing public materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (i) the Company permanently closed at least 30 stores; (ii) the Company's reported SSS and AUV data had been misstated by excluding the underperforming stores; (iii) eight out of 10 of the Company's brands were operating at a net loss monthly; (iv) the majority of the Company's store brands were operating at a net loss; (v) more than 60% of the Company's revenue was one-time and not recurring; (vi) over 100 of the Company's franchises were for sale at a net price that was at least 75% lower than their initial cost; (vii) the Company had deceived many of its franchisees into opening franchises by misrepresenting the financial profitability and profile of its studios, in addition to the anticipated rate of return for new studio openings; (viii) as a result, many of the Company's franchisees were in substantial debt, experienced high attrition rates, and operated non-viable studios that had no practical path to profitability; and (ix) the Company lacked internal controls. As a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis at all relevant times.

16. The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact while, during the Relevant Period, Defendants Geisler and Grabowski both engaged in insider trading.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

17.    Furthermore, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. The Individual Defendants caused Xponential to repurchase approximately 2,010,050 shares of the Company's stock at artificially inflated prices between August 1, 2023 and August 31, 2023 for over $38 million, and 588,827 shares between October 1, 2023, and October 31, 2023 for over $9 million. As the Company's common stock was actually worth only $8.99 per share, the price at which it was trading when the truth emerged on December 11, 2023, the Company overpaid by approximately $26 million in total for repurchases of its own stock during the Relevant Period.

18.    As detailed herein, and as alleged in the federal securities class action pending in this Court, styled *City of Taylor General Employees Retirement System v. Xponential Fitness, Inc., et al.*, Case No. 8:24-cv-00285 (the "**Securities Class Action**"), Xponential's officers and directors substantially damaged the Company by making false and misleading statements and/or omitting material adverse facts from the Company's public filings.

19.    In light of the Individual Defendants' misconduct – which has subjected the Company, its CEO, and its CFO to the Securities Class Action and which has further subjected the Company to, *inter alia*, losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefited from the wrongdoing alleged herein – the Company will have to expend many millions of dollars. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

20.    While the Company was harmed by the Individual Defendants' wrongful conduct, Defendants Geisler and Grabowski fared much better. During the Relevant Period, the Individual Defendants took advantage of their knowledge of adverse material nonpublic information ("**MNPI**") to arrange for Defendants Geisler and Grabowski, the Company's two largest shareholders, to sell portions of their holdings at inflated prices pursuant to two secondary public offerings ("**SPOs**"), reaping **over $260 million** in profits at the expense of Xponential.

21.    In light of, among other things, the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, a majority of the Board cannot consider

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## II.    JURISDICTION AND VENUE

22.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and Section 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1).  This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

23.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that would not otherwise have such jurisdiction.

24.    The court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction permissible under traditional notions of fair play and substantial justice.

25.    Venue is proper in this District because the Company is headquartered in this District and the Individual Defendants have been involved in business in this District. Further, Defendants' actions have had an effect in this District.

## III.    THE PARTIES

### A.   Plaintiff

26.    Plaintiff Patrick Ayers is and has continuously been a stockholder of Xponential during the wrongdoing complained of herein.

### B.   Nominal Defendant

27.    Defendant Xponential is a Delaware corporation with its principal executive offices at 17877 Von Karman Ave, Suite 100, Irvine, California 92614. Xponential's common stock trades on the New York Stock Exchange ("**NYSE**") under the ticker symbol "XPOF."

### C.   Director Defendants

28.    Defendant Anthony Geisler ("**Geisler**") is the founder of Xponential and has served as the Company's CEO and as a director since 2017. As of March 1, 2023, Defendant Geisler beneficially owned

approximately $220 million worth of Xponential common stock, representing 16% of the total combined voting power of the Company. For the 2021 and 2022 fiscal years, Defendant Geisler received $23,961,957 in total compensation from the Company. Moreover, during the Relevant Period, Defendant Geisler sold over 1.7 million shares of Xponential stock on the basis of adverse MNPI, reaping proceeds of more than $46 million.

29.    Defendant Jair Clarke ("**Clarke**") has served as a member of the Board since July 2022. Defendant Clarke also served as a member of the Audit Committee and the Human Capital Management Committee during the Relevant Period. For the 2022 fiscal year, Defendant Clarke received $103,272 in total compensation from the Company.

30.    Defendant Mark Grabowski ("**Grabowski**") has served as Chair of the Board since May 2015. Defendant Grabowski also serves as the Chair of both the Human Capital Management Committee and the Nominating and Corporate Governance Committee. As of March 1, 2023, Defendant Grabowski beneficially owned approximately $363 million worth of Xponential common stock, representing 27% of the total combined voting power of the Company.  For the 2021 and 2022 fiscal years, Defendant Grabowski received $607,949 in total compensation from the Company. Moreover, during the Relevant Period, Defendant Grabowski sold nearly 10 million shares of Xponential stock on the basis of adverse MNPI, reaping approximately $220 million in proceeds.

31.    Defendant Chelsea A. Grayson ("**Grayson**") has served as a member of the Board since October 2021. Defendant Grayson also served as a member of the Audit Committee and a member of the Nominating and Corporate Governance Committee during the Relevant Period. For the 2021 and 2022 fiscal years, Defendant Grayson received $262,771 in total compensation from the Company.

32.    Defendant Brenda Morris ("**Morris**") has served as member of the Board since May 2019. Defendant Morris also served as Chair of the Audit Committee, and as a member of both the Human Capital Management Committee and the Nominating and Corporate Governance Committee during the Relevant Period. For the 2021 and 2022 fiscal years, Defendant Morris received $376,625 in total compensation from the Company.

33.    Collectively, defendants Clarke, Grayson, and Morris, are referred to herein as the "**Audit Committee Defendants**."

**D.    Officer Defendant**

34.    Defendant John P. Meloun ("**Meloun**") has served as the Company's CFO since 2018. For the 2021 and 2022 fiscal years, Defendant Meloun received more than $6.4 million in total compensation from the Company.

**E.    Relevant Non-Party**

35.    Non-party Jeffrey Lawrence ("**Lawrence**") has been a member of the Board since April 2024. He currently serves as a member of the Audit Committee.

**IV.    SUBSTANTIVE ALLEGATIONS**

**A.    Background**

36.    Created by Defendant Geisler in 2017, Xponential claims to be the largest global franchisor of boutique fitness brands, with a platform offering 10 brands in categories that include Pilates, indoor cycling, barre, stretching, rowing, dancing, boxing, running, functional training, and yoga.

37.    The Company represents that its franchisees offer accessible and personalized workout experiences across 48 U.S. states, the District of Columbia, and Canada. Xponential also maintains master franchise or international expansion agreements in 14 additional countries. By the end of 2022, Xponential had over 1,700 franchisees and licenses for more than 1,900 studios contractually obligated to be opened under existing franchise agreements in North America.

38.    According to the Company's SEC filings, its portfolio brands include: (1) Club Pilates, the largest Pilates brand in the United States; (2) CycleBar, the largest indoor cycling brand in the United States; (3) StretchLab, a concept offering one-on-one and group stretching services; (4) Row House, the largest franchised indoor rowing brand in the United States; (5) AKT, a dance-based cardio workout combining toning, interval, and circuit training; (6) YogaSix, the largest franchised yoga brand in the United States; (7) Pure Barre, a total body workout that uses the ballet barre to perform small isometric movements, and the largest barre brand in the United States; (8) Stride, a treadmill-based cardio and strength training concept; (9) Rumble, a boxing-inspired full-body workout; and (10) Body Fit Training, a functional training and strength-based program.

39.    In July 2021, the Individual Defendants took the Company public through an initial public offering ("**IPO**"), selling over 10 million Xponential shares (including a partial exercise of the

underwriters' overallotment option) at $12 per share.

40.    In the years since the IPO, the Company has conducted additional registered stock offerings, which allowed insiders Geisler and Grabowski to sell additional stock.

41.    In April 2022, the Company completed a secondary public offering ("**SPO**") pursuant to which 4.5 million shares of the Company's Class A common stock were offered to the public by affiliates of Snapdragon Capital Partners, which is controlled Defendant Grabowski. In February 2023, the Company completed another SPO of 5 million shares. The selling shareholders included Snapdragon Capital Partners and Defendant Geisler, the Company's CEO.

42.    The Company did not receive any proceeds from these sales but, while misleading the market as to the Company's financial health, Defendants Geisler and Grabowski reaped proceeds of nearly $250 million pursuant to the two SPOs.

### B.    The Individual Defendants' False and Misleading Statements

43.    On July 26, 2021, the Company filed with the SEC a prospectus for the IPO on Form 424B4, which incorporated and formed part of a registration statement signed by the Individual Defendants (the "**Prospectus**"). The Prospectus stated that the Company had generated long-term "AUV of $449 thousand and $283 thousand in 2019 and 2020, respectively, and $453 thousand and $257 thousand for the three months ended March 31, 2020, and 2021, respectively." The Prospectus further stated that Xponential provided "franchisees extensive support to help maximize the performance of their studios, while leveraging [its] corporate platform to accelerate growth and enhance profitability."

44.    On August 24, 2021, the Company issued a press release announcing its financial results for the second fiscal quarter ending on June 30, 2021 (the "**2Q21 Release**"). The 2021 Q2 Release stated the Company had achieved year-over-year system wide SSS growth of 129% and a "[r]ecovery of nearly 90% run-rate AUVs as compared to January 31, 2020, placing the Company on track to reach pre-pandemic run-rate AUVs by early 2022."

45.    On August 25, 2021, the Company filed its quarterly report on Form 10-Q with the SEC for the second fiscal quarter ended June 30, 2021 (the "**2021 Q2 10-Q**"). The 2021 Q2 10-Q was signed by Defendant Meloun and contained certifications, pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("**SOX**") and signed by Defendants Geisler

and Meloun, attesting to the accuracy of the financial statements contained in the 2021 Q2 1-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors. The 2021 Q2 10-Q contained the same statements as those in the 2Q21 Release.

46.    On November 11, 2021, the Company issued a press release announcing its financial results for the third fiscal quarter ending September 30, 2021 (the "**3Q21 Release**"). The 3Q21 Release stated that the Company had achieved year-over-year North American SSS growth of 65% and a "[n]early 90% year North American run-rate average unit volume (AUV) compared to January 31, 2020."

47.    On November 12, 2021, the Company filed its quarterly report on Form 10-Q with the SEC for the third fiscal quarter ended September 30, 2021 (the "**2021 Q3 10-Q**"). The 2021 Q3 10-Q was signed by Defendant Meloun and contained SOX certifications signed by Defendants Geisler and Meloun attesting to the accuracy of the financial statements contained in the 2021 Q3 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors. The 2021 Q3 10-Q contained the same statements regarding the Company's alleged quarterly results as those contained in the 3Q21 Release.

48.    On March 3, 2022, the Company issued a press release announcing its financial results for the fourth fiscal quarter and year ending December 31, 2021 (the "**FY21 Release**"). The FY21 Release stated that the Company had achieved year-over-year North American SSS growth of 53% and run-rate AUV of $446,000 for the quarter compared to run-rate AUV of $286,000 in the prior-year period.

49.    On March 7, 2022, the Company filed its Form 10-K with the SEC for the quarter and year ended December 31, 2021 (the "**2021 10-K**"). The 2021 10-K was signed by Defendants Geisler, Meloun, Grabowski, Morris, and Grayson. It also contained SOX certifications signed by Defendants Geisler and Meloun, attesting that the filing was free from fraud and was accurate and materially complete. The 2021 10-K contained the same statements regarding the Company's purported quarterly results as those contained in the FY21 Release. The 2021 10-K also stated: "Approximately 77% of our revenue in 2021 and 73% of our revenue in 202 was considered recurring, and we believe this percentage will increase as franchise royalty fees are expected to account for a greater percentage of our revenue over time."

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

50.     Also on March 7, 2022, Xponential presented at the Raymond James Institutional Investors conference. During the conference, Defendant Geisler represented to investors that "[w]e have never permanently closed the store in the history of our business," stating in pertinent part as follows:

> So affluent, engaged customers, fastest-growing segment of the $97 billion fitness industry. Through COVID, while the industry contracted by 30%, we actually grew. **We have never permanently closed the store in the history of our business.** We actually closed about 1,500 stores temporarily for COVID, and we opened up 25% more than that when we reopened.

51.     On May 12, 2022, the Company issued a press release announcing its financial results for the first fiscal quarter ending March 31, 2022 (the "**1Q22 Release**"). The 1Q22 Release stated the Company achieved year-over-year North American SSS growth of 47% and run-rate AUV of $450,000 for the quarter.

52.     On May 13, 2022, the Company filed its form 10-Q with the SEC for the first fiscal quarter ended March 31, 2022 (the "**2022 Q1 10-Q**"), which was signed by Defendant Meloun. Defendants Geisler and Meloun also provided SOX certifications that the filing was free from fraud and attesting that the financial statements contained therein were accurate and materially complete. The 2022 Q1 10-Q contained the same statements regarding the Company's alleged quarterly results as those contained in the 1Q22 Release.

53.     On July 27, 2022, the Company issued a press release, announcing it expected to yield strong results for the second fiscal quarter of 2022 and it was on track to meet or exceed 2022 full-year guidance. The press release also provided preliminary operating highlights for the second quarter of 2022, ending June 30, 2022, including 25% SSS growth and run-rate AUV of $480,000.

54.     On August 11, 2022, the Company issued a press release announcing its financial results for the second fiscal quarter ending June 30, 2022 (the "**2Q22 Release**"). The 2Q22 Release stated the Company achieved year-over-year North American SSS growth of 25% and run-rate AUV of $480,000 for the quarter.

55.     That same day, the Individual Defendants held a conference call with analysts and investors to discuss the Company's performance for the second fiscal quarter of 2022. During the earnings call, Defendant Geisler highlighted the purported profitability of the Company's studio locations, stating:

> Importantly, **as we continue to open more studios and as AUVs continue to grow, our profitability increases**, driven by high-margin royalties from

growing system-wide sales with an active pipeline of approximately 2,800 studios contractually obligated to open globally and only about 3/4 of our conservative North American total addressable market currently penetrated.

**Studio openings are not expected to slow anytime soon, continuing to drive profitability.**

56.     On August 12, 2022, the Company filed its Form 10-Q with the SEC for the second fiscal quarter ended June 30, 2022 (the "**2022 Q2 10-Q**"), which was signed by defendant Meloun. Defendants Geisler and Meloun also provided SOX certifications that the filing was free from fraud and that the financial statements contained therein were accurate and materially complete. The 2022 Q2 10-Q contained the same statements regarding the Company's alleged quarterly results as those contained in the 2Q22 Release.

57.     On November 10, 2022, the Company issued a press release announcing its financial results for the third fiscal quarter ending September 30, 022 (the "**3Q22 Release**"). The 3Q22 Release stated that the Company achieve year-over-year North American SSS growth of 17% and run-rate AUV of $489,000 for the quarter.

58.     That same day, the Individual Defendants held an earnings conference call with analysts and investors to discuss the Company's performance for the third fiscal quarter of 2022. During the earnings call, Defendant Meloun highlighted the Company's purported AUV and claimed that the figure could reach into the "high 600s" stating:

> AUVs will continue to increase over time. I do think long term or even in the short term, you'll see elevated same-store sales throughout 2023, probably getting back to that mid to high single digits at the end of next year.
>
> With that, obviously, AUVs will continue to climb. What is that ceiling at which you kind of – it's kind of like a car, right, and they can only go so fast because at some point, they're pushing through air and it's hard to move faster and faster. **But I think our AUVs, we don't know where that's at yet. Is it possible that we do see getting to the high 600s? I do think that's definitely a possibility having the entire system pushing close to 600,000 AUV. We're at $500,000 roughly now, and we're definitely not slowing down from a growth perspective**.

59.     Also on November 10, 2022, the Company filed its Form 10-Q with the SEC for the third fiscal quarter ended September 30, 2022 (the "**2022 Q3 10-Q**"). The 2022 Q3 10-Q was signed by Defendant Meloun. Defendants Geisler and Meloun also provided SOX certifications that the filing was

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

free from fraud and is accurate and materially complete. The 2022 Q3 10-Q also contained the same statements regarding the Company's alleged quarterly results as those contained in the 3Q22 Release.

60.    On March 2, 2023, the Company issued a press release announcing its financial results for the fourth fiscal quarter and full year ending December 31, 2022 (the "**FY22 Release**"). The FY22 Release stated that the Company achieved year-over-year North American SSS growth of 17% and run-rate AUV of $522,000 for the fourth quarter.

61.    That same day, the Individual Defendants held an earnings conference call with analysts and investors to discuss the Company's performances for the fourth quarter of 2022 and the 2022 fiscal year. During the call, Defendant Meloun claimed that the Company's large AUV growth in 2022 continued into 2023, stating:

> **We had really strong AUV growth in 2022. The momentum so far into 2023 is very promising. So for us, the more studios we get open, the more our installed base continues to exceed expectations, 20%, 22%, 25% same-store sales, high teens in Q4. So far in Q1, we're seeing that carry into the year.**

62.    On March 6, 2023, the Company filed its Form 10-K with the SEC for the year ended December 31, 2022 (the "**2022 10-K**"), which was signed by defendants Geisler, Meloun, Grabowski, Morris, Grayson, and Clarke. Defendants Geisler and Meloun also provided SOX certifications that the filing was free from fraud and that the financial statements contained therein were accurate and materially complete. The 2022 10-K contained the same statements regarding the Company's alleged quarterly results as those contained in the FY22 Release. The 2022 10-K also stated: "Approximately 71% of our revenue in 2022 and 77% of our revenue in 2021 was considered recurring, and we believe this percentage will increase as franchise royalty fees are expected to account for a greater percentage of our revenue over time."

63.    On May 4, 2023, the Company issued a press release announcing its financial results for the first fiscal quarter ending March 31, 2023 (the "**1Q23 Release**"). The 1Q23 Release stated the Company achieved year-over-year North American SSS growth of 20% and run-rate AUV of $542,000 for the quarter.

64.    That same day, the Company held an earnings conference call with analysts and investors to discuss the Company's performance for the first quarter of 2023. During the call, Defendant Geisler

highlighted the Company's purported robust AUV and SSS growth, stating:

> We believe that AUV growth is the most direct measure of the health of our franchise system, and **I am pleased to report the momentum in AUV growth has continued to build in the second quarter. We also saw same-store sales growth of 20% in the first quarter, up from 17% in the previous two quarters.**

65.    On May 5, 2023, the Company filed its Form 10-Q with the SEC for the first fiscal quarter ended March 31, 2023 (the "**2023 Q1 10-Q**"), which was signed by Defendant Meloun. Defendants Geisler and Meloun also provided SOX certifications that the filing was free from fraud and that the financial statements contained therein were accurate and materially complete. The 2023 Q1 10-Q contained the same statements regarding the Company's alleged results as those contained in the 1Q23 Release.

66.    The statements above were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose, *inter alia*, that: (a) the Company permanently closed at least 30 stores; (b) the Company's reported SSS and AUV data had been misstated by excluding underperforming stores; (c) eight out of 10 of the Company's brands were operating at a net loss monthly; (d) over 50% of the Company's studios did not make a positive financial return; (e) over 60% of the Company's revenue was one-time and non-recurring; (f) over 100 of the Company's franchises were for sale at a price that was at least 75% lower than their initial cost; (g) the Company misled many of its franchisees into opening franchises by misrepresenting the financial profile and profitability of its studios, as well as the expected rate of return for new studio openings; (h) as a result, many of the Company's franchisees were in substantial debt, experienced high attrition rates and operated non-viable studios that no realistic path to profitability; and (i) that based on the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis at all relevant times.

### C.    The Truth Emerges

67.    The truth about the Company began to emerge when the Fuzzy Panda Report was published on June 26, 2023. The Fuzzy Panda Report was reportedly based on the examination of over 16,000 pages of documents, including Franchise Disclosure Documents ("**FDDs**") filed with the Federal Trade Commission and various state regulators, as well as a "multitude of interviews" and other information. The Fuzzy Panda Report stated that the allegations contained therein "often had multiple sources tell us

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

corroborating facts" and that the authors would "happily provide interview transcripts, contact information, and any other documentation received from those sources who have agreed we can share the information with the SEC, State Attorneys Generals, government regulators, or reputable journalists."

68.     The Fuzzy Panda Report alleged, among other things, that Defendant Geisler had a long history of misleading investors, including being exposed on camera for using "boiler room" tactics to mislead investors in connection with a prior venture and issuing false claims that Xponential "never closed a store." The Fuzzy Panda Report also revealed that its examination of 64 FDDs demonstrated that eight of 10 Xponential brands are losing money monthly and more than 50% of its studios never make a positive financial return. Further, according to the Fuzzy Panda Report, more than 100 of Xponential's franchises were for sale at a price 75% less than their initial cost and the SSS and AUV figures the Company reports to investors selectively and misleadingly exclude underperforming stores.

69.     Following the publication of the Fuzzy Panda Report, the price of Xponential common stock declined $9.39 per share, more than 37%, on heavy trading volume.

70.     The price of Xponential common stock, however, still remained artificially inflated because of the Individual Defendants' denials and continued dissemination of materially false and misleading statements.

71.     Specifically, on June 28, 2023, the Company issued a response to the Fuzzy Panda Report. Although the Company's response attempted to refute the Fuzzy Panda Report, it did not directly address certain allegations in the report. For example, the Company's response did not address the claim that eight out of 10 of its brands were losing money or deny that any stores had been permanently closed. With respect to the Company's calculation of SSS and AUV, the response stated, in relevant part:

> AUV Calculation: Quarterly Run-rate AUV consists of average quarterly sales for all studios that are at least six months old at the beginning of the respective quarter, multiplied by four. Studios with zero sales in the period have always been excluded from the calculation. Inclusion of these studios would not result in a material difference. For Q1 2023, recalculating Xponential's systemwide AUV to include these studios would result in a 0.9% change to the AUV figure ($542,000 vs. $538,000).

> SSS Calculation: Studios are not included in the SSS calculations unless they have 13 months of continuous sales. This is a common method for calculating same store sales and is disclosed in Xponential's audited SEC filings. The Q1 2023 data set of almost 2,000 studios open continuously for 13 months or longer as of March 31, 2023 yielded robust Q1 2023 same store sales of 20%.

72.     A Piper Sandler report issued in support of the Company summarized that: "Any studio that generates zero sales for even just one month is removed until 13 consecutive months of sales are generated again." Although the Company's statements and the Piper Sandler report sought to downplay the impact of the Company's improper accounting tactics on the Company's overall financial results, they confirmed a key allegation of the Fuzzy Panda Report: the Company excludes studios that have no sales in a given month, even if the lack of sales is due to underperformance.

73.     Even after the market had time to adjust to the Company's response, the price of Xponential common stock remained substantially lower than the price of the stock prior to the release of the Fuzzy Panda Report. This suggests that the market found the Fuzzy Panda Report to be credible and the Company's response to be insufficient in effectively rebutting the report's allegations. Morgan Stanley, a buy-side analyst who is generally supportive of the Company, stated that the "issues raised around economics/studio performance are likely to remain a focus for investors and would benefit from better disclosures."

74.     On December 7, 2023, despite the Individual Defendants' attempts to continue misrepresenting the state of the Company, the truth was fully exposed when Businessweek published an article on Xponential that largely corroborated the Fuzzy Panda Report's allegations. The article, titled "*Club Pilates, Pure Barre Owners Say Xponential Left Them Bankrupt*," stated that Businessweek interviewed many former business partners, employees, and franchises of the Company who revealed that Xponential misled and misguided many Xponential franchisees into a "financial nightmare." The article also stated that Defendant Geisler "has a track record of combative management, deploying growth-at-all-costs tactics and unleashing aggressive reprisals against anyone who gets in his way" and that these tactics caused "many of the company's franchisees . . . [to] have either declared bankruptcy or los[e] their retirement savings."

75.     Following the publication of the Businessweek article, the price of the Company's common stock fell more than 26% over two trading days – on heavy trading volume – to close at less than $9 per share on December 11, 2023.

D. **Repurchases During The Relevant Period**

76.     During the Relevant Period, the Individual Defendants caused the Company to initiate

repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of over $49.9 million to repurchase approximately 2.5 million shares of its own common stock at artificially inflated prices in August 2023 and October 2023.

77.     According to the quarterly report on Form 10-Q filed by the Company on November 8, 2023, between August 1, 2023, and August 31, 2023, the Company purchased 2,010,050 shares of its own common stock at an average price per share of approximately $19.90, for a total cost to the Company of $39,999,995.

78.     As the Company's stock was actually worth only $8.99 per share, the price at closing on December 11, 2023, the Company overpaid by approximately $21,929,645 for repurchases of its own stock between August 1, 2023 and August 31, 2023.

79.     Further, according to the annual report on Form 10-K filed by the Company on March 4, 2024, between October 1, 2023 and October 31, 2023, the Company purchased 588,827 of its own common stock at an average price per share of approximately $16.98, for a total cost to the Company of approximately $9,998,282.46.

80.     As the Company's stock was actually worth only $8.99 per share, the price at closing on December 11, 2023, the Company overpaid by approximately $4,704,727 for repurchases of its own stock between October 1, 2023, and October 31, 2023.

81.     Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by more than $26 million.

## V.     **FIDUCIARY DUTIES**

82.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and continues to owe Xponential and its stockholders' fiduciary obligations of trust, loyalty, good faith, and due care and was/is required to use his/her utmost ability to control and manage Xponential in a fair, just, honest, and equitable manner. The Individual Defendants were/are required to act in furtherance of the best interests of Xponential and its stockholders to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

83.     Each Individual Defendant owes and continues to owe Xponential, and its stockholders, the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

in the use and preservation of its property and assets.

84.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Xponential, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their executive and/or directorial positions with Xponential, each of the Individual Defendants had knowledge of material, nonpublic information regarding the Company. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls so that the market price of the Company's stock would be based on truthful and accurate information.

85.    To discharge their duties, the Individual Defendants were/are required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. The Individual Defendants were required to, among other things:

Ensure that the Company complied with its legal obligations and requirements—including requirements involving the filing of accurate financial and operational information with the SEC—and refrain from engaging in insider trading and other deceptive conduct;

Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Xponential's own Code of Conduct;

Conduct the affairs of the Company in compliance with all applicable laws, rules, and regulations to make it possible to provide the highest quality performance of its business, avoid wasting the Company's assets, and maximize the value of the Company's stock;

Remain informed as to how Xponential conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make a reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws;

Establish and maintain systematic and accurate records and reports of the business and internal affairs of Xponential and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Xponential's operations could comply with all applicable laws and the Company's financial statements and regulatory filings filed with the SEC and disseminated to the public and Company's shareholders would be accurate;

86.     Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

87.     Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above; and

88.     Truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

89.     The Individual Defendants, because of their advisory, executive, managerial, and directorial positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the content of the various public statements issued by Xponential.

90.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Xponential and were at all times acting within the course and scope of such agency.

**A.    <u>Duties Pursuant to the Company's Code of Business Conduct</u>**

91.     The Individual Defendants, as officers and/or directors of Xponential, were bound by the Company's Code of Business Conduct and Ethics[1] (the "**Code of Conduct**") which provides:

> We must strive to foster a culture of honesty and accountability. Our commitment to the highest level of ethical conduct should be reflected in all of the Company's business activities including, but not limited to, relationships with employees, customers, suppliers, competitors, the government, the public and our shareholders. All of our employees, officers and directors must conduct themselves according to the language and spirit of this Code and seek to avoid even the appearance of improper behavior. Even well-intentioned actions that violated the law or this Code may result in negative consequences for the Company and for the individuals involved.
>
> One of our Company's most valuable assets is its reputation for integrity, professionalism and fairness. We should all recognize that our actions are the foundation of our reputation and adhering to this Code and applicable law is imperative.

---

[1] *See* Xponential Fitness, Inc. Code of Business Conduct and Ethics (June 24, 2021), https://d1io3yog0oux5.cloudfront.net/_334e3f82a7ee17500e174b9193dc51e8/xponential/db/867/7511/file/XPO+-+Code+of+Business+Conduct_FINAL.pdf.

92.     A section of the Code of Conduct titled "Compliance with Laws, Rules and Regulations" states the following:

> We are strongly committed to conducting our business affairs with honest and integrity and in full compliance with all applicable laws, rules and regulations. No employee, officer or director of the Company shall commit an illegal or unethical act, or instruct other to do so, for any reason.

93.     A section of the Code of Conduct titled "Trading on Inside Information" states the following:

> Using non-public, Company information to trade in securities, or providing a family member, friend or any other person with a "tip," is illegal. All nonpublic, Company information should be considered inside information and should never be used for personal gain or to enable others to gain from trades in our stock. You are required to familiarize yourself and comply with the Company's Insider Trading Policy, copies of which are distributed to all employees, officers and directors and are available from the legal department. You should contact the legal department with any questions about your ability to buy or sell securities.

94.     A section of the Code of Conduct titled "Conflicts of Interest" states the following:

> Employees, officers and directors are expected to act, at all times and in all ways, in the best interest of the Company while performing their job duties. This means employees, officers and directors must avoid conflicts of interest. A "conflict of interest" occurs when a directors', officers' or employees' ability to perform his or her job responsibilities or duties for the Company are impacted by personal interests or the interests of a third party.

95.     A section of the Code of Conduct titled "Protection and Proper Use of Company Assets" states the following:

96.     Protecting Company assets against loss, theft or other misuse is then responsibility of every employee, officer and director. Loss, theft and misuse of Company assets directly impact our profitability. Any suspected loss, misuse or theft should be reported to a manager/supervisor or the legal department. The sole purpose of the Company's equipment, vehicles, supplies and technology is the conduct of our business. They may only be used for Company business consistent with Company guidelines.A section of the Code of Conduct titled "Corporate Opportunities" states the following:

97.     Employees, officers and directors are prohibited from taking for themselves business opportunities that are discovered through the use of corporate property, information or position. No

employee, officer or director may use corporate property, information or position for personal gain, and no employee, officer or director may compete with the Company. Competing with the Company may involve engaging in the same line of business as the Company, or any situation where the employee, officer or director takes away from the Company opportunities for sales or purchases of products, services or interests. Employees, officers and directors owe a duty to the Company to advance its legitimate interests when the opportunity to do so arises.A section of the Code of Conduct titled "Compliance with This Code and Reporting of Any Illegal or Unethical Behavior" states the following:

> All employees, directors and officers are expected to comply with all of the provisions of this Code. The Code will be strictly enforced and violations will be dealt with immediately, including by subjecting persons who violate its provisions to corrective and/or disciplinary action such as dismissal or removal from office. Violations of the Code that involve illegal behavior will be reported to the appropriate authorities.

> Situations which may involve a violation of ethics, laws, rules, regulations or this Code may not always be clear and may require the exercise of judgment or the making of difficult decisions. Employees, officers and directors should promptly report any concerns about a violation of ethics, laws, rules, regulations or this Code to their supervisors/managers and the Legal Department, or, in the case of accounting, internal accounting controls or auditing matters, the Audit Committee of the Board of Directors.

> Any concerns about a violation of ethics, laws, rules, regulations or this Code by any employee, directors and officers should be reported promptly to the legal department and the CFO, and the CFO shall notify the Audit Committee of any violation. Any such concerns involving the legal department or CFO should be reported to the Audit Committee. Reporting of such violations may also be done anonymously by opening a case within the global ethics and compliance management platform, Navex Global on the company's intranet. For more information regarding the procedures for reporting and handling complaints and concerns related to accounting or auditing matters and ethical violations or violations of the Company's policies, please refer to our "Whistleblower Policy."

> The Company encourages all employees, officers and directors to report any suspected violations promptly and intends to thoroughly investigate any good faith reports of violations. The Company will not tolerate any kind of retaliation for reports or complaints regarding misconduct that were made in good faith. Open communication of issues and concerns by all employees without fear of retribution or retaliation is vital to the successful implementation of this Code. All employees, officers and directors are required to cooperate in any internal investigations of misconduct and unethical behavior.

> The Company recognizes the need for this Code to be applied equally to everyone it covers. The legal department of the Company will have primary authority and responsibility for the enforcement of this Code, subject to the supervision of the Audit Committee, and the Company will devote the

necessary resources to enable the legal department to establish such procedures as may be reasonably necessary to create a culture of accountability and facilitate compliance with the Code. Questions concerning this Code should be directed to the legal department.

98.    A section of the Code of Conduct titled "Compliance with This Code and Reporting of Any Illegal or Unethical Behavior" states the following:

Any waiver of the provisions in this Code for executive officers or directors may only be granted by the Board of Directors or a committee of the Board and will be disclosed to the Company's shareholders within four business days. Any waiver of this Code for other employees may only be granted by the Legal Department. Amendments to this Code must be approved by the Nominating and Corporate Governance Committee of the Board of Directors and amendments of the provisions in this Code will also be promptly disclosed to the Company's shareholders.

**B.    Duties Pursuant to the Audit Committee Charter**

99.    In addition to the duties set forth in the Code of Conduct, the Audit Committee Defendants, who served on the Audit Committee during the Relevant Period, owed specific duties to Xponential pursuant to the Charter of the Audit Committee of the Board of Directors of Xponential Fitness, Inc. (the "**Audit Committee Charter**"),[2] as set forth in part below.

100.    Specifically, the Audit Committee Charter noted that the purpose of the Audit Committee is to "assist the Board in fulfilling its responsibilities for overseeing:"

(a)    The Company's accounting and financial reporting processes and internal controls, as well as the audit integrity of the Company's financial statements.

(b)    The qualifications, independence and performance of the Company's registered public accounting firm (the "independent auditor").

(c)    The design and implementation of the Company's internal audit function.

(d)    The Company's policies with respect to risk assessment and risk management pertaining to the financial, accounting and tax matters of the Company.

---

[2] *See* Charter of the Audit Committee of the Board of Directors of Xponential Fitness, Inc. (June 24, 2021), https://d1io3yog0oux5.cloudfront.net/_fc16d8c0fce518d8b46e9cac1fa8b61d/xponential/db/867/7427/file/XPO+-+Audit+Committee+Charter.pdf.

(e) The Audit Committee is also responsible for preparing the report required by the Securities and Exchange Commission ("SEC") rules to be included in the Company's proxy statement for the annual meeting of stockholders, and for performing such other duties and responsibilities as are enumerated in or consistent with this charter.

(f) Any other matters that the Audit Committee deems appropriate or is request to include by the Board.

101.   The Audit Committee Charter states that the Audit Committee shall do in relevant part regarding the supervising and evaluating the independent auditor the following:

(1) [d]iscuss with the independent auditor its responsibilities under generally accepted auditing standards.

(2) [o]verse and, at least annually, evaluate the work of the independent auditor or any other registered public accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company, which evaluation shall include a review and evaluation of the lead partner of the independent auditor as well as a confirmation and evaluation of the rotation of the audit partners on the audit engagement team as required by law. The Audit Committee shall review and approve, in consultation with the independent auditor, the annual audit plan and scope of the audit activities and monitor such plan's progress.

(3) [r]eview and resolve any disagreements that arise between management and the independent auditor regarding internal controls or financial reporting.

(4) [o]btain the opinion of management and the Company personnel primarily responsible for the design and implementation of the internal audit function of the independent auditor's performance.

102.   The Audit Committee Charter states, among the Audit Committee's responsibilities of reviewing financial statements, that the Audit Committee "may review and discuss" the following with "management, the personnel responsible for the design and implementation of the internal audit function, and the independent auditor," in relevant part:

The Company's annual audited and quarterly unaudited financial statements and annual and quarterly reports on Form 10-K and 10-Q, including the disclosures in "Management's Discussion and Analysis of Financial Condition and Results of Operations", and recommend to the Board whether the audited financial statements and "Management's Discussion and Analysis of Financial Condition and Results of Operations" should be included in the Company's Form 10-K.

The results of the independent audit and the quarterly reviews of the Company's financial statements, and the independent auditor's opinion on the annual financial statements.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles.

Analyses prepared by management or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements.

The effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the Company's financial statements.

103.    The Audit Committee Charter states, among the Audit Committee's responsibilities of drafting the Audit Committee Report, that the Audit Committee "will prepare the report of the Audit Committee that SEC rules require to be included in the Company's annual proxy statement."

104.    The Audit Committee Charter states, among the Audit Committee's responsibilities of reviewing "earnings press releases and earnings guidance":

The Audit Committee, or the chairperson of the Audit Committee, shall review, in general, earnings press releases, and review and discuss with management and the independent auditors policies with respect to earnings press releases (with particular attention to any use of "pro forma" or "adjusted" non-GAAP information), financial information and earnings guidance provided to the public, analysts and ratings agencies.

105.    The Audit Committee Charter states the following regarding "Internal Controls":

The Audit Committee shall review and discuss with management, the personnel responsible for the design and implementation of the internal audit function, and the independent auditor the adequacy and effectiveness of the Company's internal controls, including any changes, significant deficiencies or material weaknesses in those controls reported by the independent auditor, the personnel responsible for the design and implementation of the internal audit function, or management which are reasonably likely to affect the Company's ability to record, process, summarize and report financial information and any special audit steps adopted or changes required in light of any material control deficiencies, the reports and certifications regarding internal control over financial reporting and any fraud, whether or not material, that involves management or other Company employees who have a significant role in the Company's internal controls. The Audit Committee shall also review and discuss with management and the independent auditors, disclosure relating to the Company's internal controls, the independent auditor's report on the Company's internal control over financial reporting (if applicable) and required management certifications to be included in or attached as exhibits to the Corporation's Annual Reports on Form 10-K or Quarterly Reports on Form 10-Q, as applicable.

106.    The Audit Committee Charter states the following regarding "Disclosure Controls and Procedures": "The Audit Committee shall review and discuss the adequacy and effectiveness of the Company's disclosure controls and procedures and the reports and certifications over disclosure controls and procedures."

107.    The Audit Committee Charter states the following regarding "Legal and Regulatory Compliance":

> Review and discuss with management, the personnel responsible for the design and implementation of the internal audit function, and the independent auditor (i) the overall adequacy and effectiveness of the Company's legal, regulatory and ethical compliance programs, including the Company's Code of Business Conduct and Ethics, compliance with anti-bribery and anticorruption laws and regulations, and compliance with export control regulations and (ii) reports regarding compliance with applicable laws, regulations and internal compliance programs.

> Review and discuss with management and the independent auditor any correspondence with regulators or governmental agencies that raise material issues regarding the Company's financial statements or accounting policies.

> Review and discuss, with a senior member of the Company's legal department and outside legal counsel, any legal and regulatory matters, including legal cases against or regulatory investigations of the Company and its subsidiaries, that may have a material impact on the financial statements or the Company's compliance procedures.

108.    The Audit Committee Charter states the following regarding "Risk Assessment and Risk Management":

> The Audit Committee shall review and discuss with management, the personnel responsible for the design and implementation of the internal audit function, and the independent auditor the Company's major financial risk exposures and the steps management has taken to monitor and control those exposures, including the Company's guidelines and policies with respect to risk assessment and risk management pertaining to financial, accounting and tax matters. The Audit Committee may also review the Company's risk management framework and programs, as well as the framework by which management discusses the Company's risk profile and risk exposures with the Board and its committees.

109.    While the Audit Committee Charter set forth clear responsibilities with respect to ensuring that there were controls regarding the accuracy of the Company's financial disclosures and the Company's communications with the public, the Audit Committee Defendants have not fulfilled their responsibilities.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

In fact, the Audit Committee Defendants have gravely harmed the Company by taking part in the publishing of the false and misleading statements described herein.

## VI.    THE FALSE AND MISLEADING PROXY STATEMENTS

110.    In addition to the above false and misleading statements issued and/or caused to be issued by the Individual Defendants, the Individual Defendants caused the Company to issue false and misleading proxy statements filed on April 5, 2022 (the "**2022 Proxy**"), and March 31, 2023 (the "**2023 Proxy**").  The 2022 Proxy and 2023 Proxy are collectively referred to herein as the "**Proxies**."[3]

111.    The 2022 Proxy recommended shareholders vote to elect Defendant Morris to serve until the 2025 annual meeting. It also recommended shareholders vote to ratify Deloitte & Touche LLP as the Company's independent registered public accounting firm for the 2022 Fiscal Year.

112.    The 2023 Proxy recommended shareholders vote to elect Defendants Grayson and Clarke to serve until the 2026 annual meeting. It also recommended shareholders vote to ratify Deloitte & Touche LLP as the Company's independent registered public accounting firm for the 2023 Fiscal Year.

113.    The 2022 Proxy stated the following regarding the Board's role in risk oversight at the Company:

> Risk assessment and oversight are an integral part of our governance and management processes. Our Board of Directors encourages management to promote a culture that incorporates risk management into our corporate strategy and day- to-day business operations. Throughout the year, senior management reviews the risks facing us with the Board of Directors at regular Board meetings as part of management presentations that focus on particular business functions, operations or strategies, and presents the steps taken by management to mitigate or eliminate such risks.

> Our Board of Directors does not have a standing risk management committee, but rather administers this oversight function directly through the Board of Directors as a whole, as well as through various standing committees of the Board of Directors that address risks inherent in their respective areas of oversight. In particular, our Board of Directors is responsible for monitoring and assessing strategic risk exposure, including risks related to the COVID-19 pandemic, and our Audit Committee is responsible for overseeing our financial and cybersecurity risk exposures

---

[3] These proxy allegations are based solely on negligence, they are not based on any allegations of recklessness or knowing conduct by or on behalf of the Individual Defendants, and they did not allege fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the proxy allegations and related claims.

and the steps our management has taken to monitor and control these exposures.

The Audit Committee also monitors compliance with legal and regulatory requirements and considers and approves or disapproves any related person transactions. Our Nominating and Corporate Governance Committee monitors the effectiveness of the Corporate Governance Guidelines. Our Compensation Committee assesses risks arising from our compensation policies and practices and whether any such risks are reasonably likely to have a material adverse effect on us. The Board does not believe that its role in the oversight of our risks affects the Board's leadership structure.

114.    The 2022 Proxy stated the following regarding the Company's Code of Conduct:

We have a written Code of Business Conduct and Ethics that applies to our directors, officers and employees, including our principal executive officer, principal financial officer, principal accounting officer, controller, or persons performing similar functions. We have posted a current copy of the Code of Business Conduct and Ethics on our investor relations website, investor.xponential.com, in the "Governance" section under "Governance Documents." In addition, we intend to post on our website all disclosures that are required by law or the NYSE rules concerning any amendments to, or waivers from, any provision of the Code of Business Conduct and Ethics.

115.    The 2023 Proxy contained comparable provisions to the 2022 Proxy regarding risk oversight and the Audit Committee's role in risk assessment and risk management.

116.    Defendants Grabowski, Grayson, Morris, and Geisler caused the Proxies to be false and misleading by failing to disclose that: (1) the Board's, and its committees', risk oversight functions were not being exercised as described, as evidenced by the occurrence of the wrongdoing alleged herein, which involved members of the Board; and (2) though the Proxies claimed the Company's Code of Conduct applied to the Company's officers and directors, the Individual Directors violated the Code of Conduct with no consequences.

117.    Defendants Grabowski, Grayson, Morris, and Geisler caused the Proxies to be false and misleading, and failed to disclose material facts necessary to make the statement not false and misleading, because the Proxies failed to disclose, *inter alia*, that: (a) the Company permanently closed at least 30 stores; (b) the Company's reported SSS and AUV data had been misstated by excluding the underperforming stores; (c) eight out of 10 of the Company's brands were operating at a net loss monthly; (d) over 50% of the Company's studios did not make a positive financial return; (e) over 60% of the Company's revenue was one-time and non-recurring; (f) over 100 of the Company's franchises were for sale at a price that was at least 75% lower than their initial cost; (g) the Company misled many of its

franchisees into opening franchises by misrepresenting the financial profile and profitability of its studios, as well as the expected rate of return for new studio openings; (h) as a result, many of the Company's franchisees were in substantial debt, experienced high attrition rates and operated non-viable studios that no realistic path to profitability; and (i) the Company lacked adequate internal controls.

118. As a result of the Company's false and misleading statements in the Proxies, the Company's stockholders voted via uninformed stockholder votes to reelect the Individual Defendants proposed for reelection in the Proxies.

## VII.    BREACHES OF DUTIES

119. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and/or directors of Xponential, the absence of good faith on their part, and a reckless disregard for their duties to the Company.

120. The Individual Defendants breached their fiduciary duties by allowing the Company to make improper statements to the public and the Company's stockholders.

121. The Audit Committee Defendants had a duty to review the Company's earnings press releases and regulatory filings. The Audit Committee Defendants breached their duty of loyalty and good faith by approving the omission of material information, making the improper statements detailed herein, and failing to properly oversee Xponential's public statements and internal control function.

122. The Individual Defendants, because of their positions of control and authority as officers and/or directors of Xponential, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. In addition, because of Individual Defendants' improper course of conduct, the Company is now the subject of the Securities Class Action, which alleges violations of federal securities laws. As a result, Xponential has expended, and will continue to expend, significant sums of money.

## VIII.    DAMAGES TO XPONENTIAL

123. As a direct and proximate result of the Individual Defendants' conduct, Xponential has expended and will continue to expend significant sums of money.

124. Such expenditures include, but are not limited to, legal fees associated with the

aforementioned Securities Class Action filed against the Company for violations of the federal securities laws. Xponential will incur additional expenditures and economic harm due to, among other things, amounts paid to outside lawyers, accountants, and investigators in connection with internal investigations, and payments associated with the aforementioned issues.

125. Such losses also include the Company's overpayment of nearly $26 million for repurchases of its own stock during the relevant period when the Company's stock price was artificially inflated due to Defendant's false and misleading statements discussed above.

126. As a direct result of the Individual Defendants' conduct, Xponential has suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's action and misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## IX.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

127. Plaintiff repeats and re-alleges each and every allegation above as though fully set forth herein.

128. Plaintiff brings this action derivatively in the right and for the benefit of Xponential to redress injuries suffered, and to be suffered because of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Xponential, unjust enrichment, and violations of Sections 14(a) and 20(a) of the Exchange Act.

129. Xponential is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

130. Plaintiff is, and has been continuously at all relevant times, a stockholder of Xponential. Plaintiff will adequately and fairly represent the interests of Xponential in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

131. Plaintiff incorporates by reference and re-alleges each allegation stated above as if fully set forth herein.

132. A pre-suit demand on the Board of Xponential is futile and, therefore, excused. At the time of filing this action, the Board consists of six directors: defendants (i) Geisler; (ii) Clarke; (iii) Grabowski;

(iv) Grayson; and (v) Morris (collectively, the "**Director Defendants**"), as well as (vi) non-party Lawrence. Plaintiff needs only to allege demand futility as to half of the directors who are on the Board at the time this action was filed (*i.e.* three directors).

133.    Plaintiff did not make a demand on the Board prior to bringing this stockholder derivative suit because, as set forth below, at least half of the Board faces a substantial likelihood of personal liability and is therefore incapable of making an independent and disinterested decision to bring the claims herein.

134.    Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme in which they engaged, knowingly or recklessly, to make and/or cause the Company to make false and misleading statements and omissions of material fact, while they cause the Company to overpay by nearly $26 million for repurchases of its own stock during the period when the Company's stock price was artificially inflated as a result of the Individual Defendants' false and misleading statements. This renders the Director Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

135.    Moreover, the Director Defendants solicited the 2023 Proxy and Defendants Grabowski, Grayson, Geisler, and Morris solicited the 2022 Proxy. The Proxies were false and misleading in violation of Section 14(a) of the Exchange Act. Therefore, demand upon them is futile and further excused.

A.    **The Board Faces a Substantial Likelihood of Liability**

136.    In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly caused or permitted Xponential to make the materially false and misleading statements alleged herein. Specifically, the Director Defendants knowingly or recklessly made material misrepresentations and/or omission for the purpose and effect of concealing Xponential's financial well-being and prospects from the investing public and supporting the artificially inflated price of Xponential's securities. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

137.    The Director Defendants, together and individually, violated and breached their fiduciary duties by knowingly approving and/or permitting the wrongs alleged herein and participating in efforts to conceal those wrongs.

138.     Additionally, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

139.     Each of the Director Defendants authorized, signed, and/or permitted the false and misleading statements described herein, including the Company's 2021 10-K, 2022 10-K, 2021 Q2 10-Q, 2021 Q3 10-Q, 2022 Q1 10-Q, 2022 Q2 10-Q, 2022 Q3 10-Q, and 2023 Q1 10-Q, to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

140.     The Director Defendants, as members of the Board, were and are subject to Xponential's Code of Conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

141.     Furthermore, Defendant Geisler is Xponential's founder and CEO, and has been a director at all relevant times. Moreover, Geisler holds 16% of the total voting power of the Company. The Company also provides Geisler with significant compensation for his positions at the Company, as detailed above. As CEO, Geisler was ultimately responsible for all of the false and misleading statements and omissions that were made during the Relevant Period, including in the 2021 10-K and the 2022 10-K, which he signed. Moreover, Geisler solicited the Proxies, which contained material misrepresentations and omissions and contributed to the reelection of Defendants Clarke, Grayson, and Morris, allowing them to continue breaching their fiduciary duties to the Company. As the Company's highest officer, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Geisler also engaged in insider trading, selling over 1 million shares of artificially inflated Company common stock for personal profits in excess of $46 million. Furthermore, Geisler is a defendant in the Securities Class Action. As a result,

Geisler received a material personal benefit, breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Thus, demand upon Geisler is futile and excused.

142.    Defendant Clarke has served as a Company director since July 2022. The Company provides Defendant Clarke with significant compensation for his role at the Company, as detailed above. Defendant Clarke cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood. This lack of independence and the financial benefits received by Defendant Clarke render him incapable of impartially considering a demand to commence and vigorously prosecute this action. Defendant Clarke is responsible for many of the false and misleading statements and omissions that were made during the Relevant Period, including the 2022 10-K, which he signed. Moreover, Defendant Clarke solicited the 2023 Proxy, which contained material misrepresentations and omissions and contributed to his reelection and the reelection of Defendant Grayson, allowing him and Defendant Grayson to continue breaching their fiduciary duties to the Company. Further, as a trusted Company director, Defendant Clarke conducted little, if any, oversight of the scheme that caused the Company to make false and misleading statements, consciously disregarding his duties to protect corporate assets. As a result, Defendant Clarke breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Clarke is futile and excused.

143.    Defendant Grabowski has served as Chair of the Board of Directors since May 2017 and retains 27% of the total voting power of the Company. The Company also provides Defendant Grabowski with significant compensation for his role at the Company, as detailed above. Defendant Grabowski cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood. This lack of independence and the financial benefits received by Defendant Grabowski render him incapable of impartially considering a demand to commence and vigorously prosecute this action. Defendant Grabowski is responsible for all of the false and misleading statements and omissions that were made during the Relevant Period, including the 2021 10-K and the 2022 10-K, which he signed. Moreover, Defendant Grabowski solicited the Proxies, which contained material misrepresentations and omissions and contributed to the reelection of Defendants Clarke, Grayson, and Morris, allowing them to continue breaching their fiduciary duties to the Company.

Further, as a trusted Company director, he conducted little, if any, oversight of the scheme that caused the Company to make false and misleading statements, consciously disregarding his duties to protect corporate assets. Grabowski also engaged in insider trading, selling approximately 10 million shares of artificially inflated Company common stock for proceeds of nearly $220 million. As a result, Defendant Grabowski received a material personal benefit, breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Grabowski is futile and excused.

144.    Defendant Grayson has served as a Company director since June 2020. The Company provides Defendant Grayson with significant compensation for her role at the Company as detailed above. Defendant Grayson cannot independently consider any demand to sue herself for breaching her fiduciary duties to the Company, because that would expose her to liability and threaten her livelihood. This lack of independence and the financial benefits received by Defendant Grayson render her incapable of impartially considering a demand to commence and vigorously prosecute this action. Defendant Grayson is responsible for all of the false and misleading statements and omissions that were made during the Relevant Period, including the 2021 10-K and the 2022 10-K, which she signed. Moreover, Defendant Grayson solicited the Proxies, which contained material misrepresentations and omissions and contributed to her reelection and the reelection of Defendants Clarke, and Morris, allowing her, as well as Defendants Clarke and Morris, to continue breaching their fiduciary duties to the Company. Further, as a trusted Company director, she conducted little, if any, oversight of the scheme that caused the Company to make false and misleading statements, consciously disregarding her duties to protect corporate assets. As a result, Defendant Grayson breached her fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Grayson is futile and excused.

145.    Defendant Morris has served as a Company director since May 2019. The Company provides Defendant Morris with significant compensation for her role as a director as detailed above. Defendant Morris cannot independently consider any demand to sue herself for breaching her fiduciary duties to the Company, because that would expose her to liability and threaten her livelihood. This lack of independence and the financial benefits received by Defendant Morris render her incapable of impartially considering a demand to commence and vigorously prosecute this action. Defendant Morris is responsible

for all of the false and misleading statements and omissions that were made during the Relevant Period, including the 2021 10-K and 2022 10-K, which she personally signed. Moreover, Defendant Morris solicited the Proxies, which contained material misrepresentations and omissions and contributed to her reelection and reelection of Defendants Clarke and Grayson, allowing her, as well as Defendants Clarke and Grayson, to continue breaching their fiduciary duties to the Company. As a trusted Company director, she conducted little, if any, oversight of the scheme that caused the Company to make false and misleading statements, consciously disregarding her duties to protect corporate assets. As a result, Defendant Morris breached her fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Morris is futile and excused.

146. Defendants Clarke, Grayson, and Morris served as members of the Audit Committee during the Relevant Period. The Audit Committee Defendants violated the Audit Committee Charter by failing to adequately review and discuss the Company's Forms 10-K and Forms 10-Q; failing to adequately exercise their risk management and risk assessment functions; and failing to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties and are not disinterested. Thus, demand is excused and futile as to the Audit Committee Defendants.

147. In violation of the Code of Conduct, the Director Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross management, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants violated the Code of Conduct by failing to act with integrity, failing to avoid conflict of interest, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report known violations of the Code of Conduct and the law. Thus, the Director Defendants breached the Company's own Code of Conduct, are not disinterested, and demand is excused as to them.

148. Xponential has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against themselves or any others who were responsible for the wrongful conduct to attempt to recover for

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Xponential any part of the damages Xponential suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

149.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

150.    The acts complained of herein constitute violations of fiduciary duties owed by the Company's officers and directors, and these acts or incapable of ratification.

### FIRST CLAIM

### Against the Individual Defendants

### *for Violations of Section 14(a) of the Exchange Act*

151.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

152.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these non-fraud claims.

153.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15

U.S.C. § 78l].”

154.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

155.    Under the direction and watch of Defendants Geisler, Meloun, Clarke, Grabowski, Grayson and Morris, the Proxies failed to disclose that: (1) the Company permanently closed at least 30 stores; (2) the Company's reported SSS and AUV data had been misstated by excluding the underperforming stores: (3) 8 out of 10 of the Company's brands were operating at a net loss monthly; (4) more than 50% of the Company's studios were unable to make a positive financial return; (5) more than 60% of the Company's revenue was one-time and not recurring; (6) over 100 of the Company's franchises were for sale at a price that was at least 75% lower than their initial cost; (7) the Company had deceived many of its franchisees into opening franchises by misrepresenting the financial profitability and profile of its studios, in addition to the anticipated rate of return for new studio openings; (8) as a result, many of the Company's franchisees were in substantial debt, experienced high attrition rates and operated non-viable studios that had no practical path to profitability; and (9) the Company lacked internal controls.

156.    Under the purview of Defendants Geisler, Meloun, Clarke, Grabowski, Grayson and Morris, the Proxies also failed to disclose *inter alia*, that: (1) contrary to the Proxies' descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements; and (2) the Individual Defendants were violating the Code of Conduct without obtaining waivers or else without such waivers being disclosed.

157.    In the exercise of reasonable care, Defendants Geisler, Meloun, Clarke, Grabowski, Grayson and Morris knew or should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022 Proxy were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2022 Proxy, including but not limited to, the reelection of Defendant Morris as a director and the ratification of Deloitte & Touche LLP as the Company's independent registered

public accounting firm for the 2022 Fiscal Year.

158.    In the exercise of reasonable care, Defendants Geisler, Meloun, Clarke, Grabowski, Grayson and Morris knew or should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements in the 2023 Proxy were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2023 Proxy, including but not limited to, the reelection of Defendants Grayson and Clarke as directors and the ratification of Deloitte & Touche LLP as the Company's independent registered public accounting form for the 2023 Fiscal Year.

159.    The false and misleading elements of the 2022 Proxy led Company shareholders to, *inter alia*, (1) reelect Defendant Morris to the Board, allowing her to continue to breach her fiduciary duties to the Company; and (2) ratify the appointment of Deloitte & Touche LLP as the Company's independent registered public accounting firm for the 2022 Fiscal Year.

160.    The false and misleading elements of the 2023 Proxy led Company shareholders to, *inter alia*, (1) reelect Defendants Clarke and Grayson to the Board, allowing them to continue to breach their fiduciary duties to the Company; and (2) ratify the appointment of Deloitte & Touche LLP as the Company's independent registered public accounting firm for the 2023 Fiscal Year.

161.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxies.

162.    Plaintiff, on behalf of Xponential, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants

*for Violation of Section 20(a) of the Exchange Act*

163.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

164.    The Individual Defendants, by virtue of their positions with Xponential and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Xponential and officers and directors who made the false and misleading statements alleged herein within the meaning of Section 20(a) of the Exchange Act. The Individual Defendants had the power and influence, and exercised same, to cause

Xponential to engage in the illegal conduct and practices complained of herein.

165.    Plaintiff, on behalf of Xponential, has no adequate remedy at law.

### THIRD CLAIM

**Against Individual Defendants**

*for Breach of Fiduciary Duties*

166.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

167.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Xponential's business and affairs.

168.    Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

169.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached their fiduciary duties to protect the rights and interests of Xponential.

170.    In breach of their fiduciary duties, the Individual Defendants caused the Company to engage in the misconduct described herein.

171.    In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure, controls, and procedures.

172.    Also in breach of their fiduciary duties, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements during the Relevant Period by omitting to state, *inter alia*, that; (a) the Company permanently closed at least 30 stores; (b) the Company's reported SSS and AUV data had been misstated by excluding underperforming stores; (c) eight out of 10 of the Company's brands were operating at a net loss monthly; (d) over 50% of the Company's studios did not make a positive financial return; (e) over 60% of the Company's revenue was one-time and non-recurring; (f) over 100 of the Company's franchises were for sale at a price that was at least 75% lower than their initial cost; (g) the Company misled many of its franchisees into opening franchises by misrepresenting the financial profile and profitability of its studios, as well as the expected rate of return for new studio openings; (h) as a result, many of the Company's franchisees were in substantial debt,

experienced high attrition rates and operated non-viable studios that no realistic path to profitability; and (i) based on the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis at all relevant times.

173.    Further, the Individual Defendants have specific fiduciary responsibilities as defined by the Company's corporate governance documents that, had they been faithfully discharged, would have necessarily prevented the misconduct and subsequent harm to Xponential.

174.    The Individual Defendants failed to correct and/or caused the Company to fail to correct the wrongs described herein, rendering them personally liable to the Company for breach of fiduciary duty.

175.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants either had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

176.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

177.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

178.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Xponential has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

179.    Plaintiff, on behalf of Xponential, has no adequate remedy at law.

## FOURTH CLAIM

### Against Defendants Geisler and Grabowski

*for Breach of Fiduciary Duty by Insider Trading*

180.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

181.    Defendants Geisler and Grabowski owned the Company duties of loyalty, good faith, and care as officers and directors of the Company. This includes the duty not to trade in the Company's stock on the basis of MNPI. Nevertheless, Defendants Geisler and Grabowski traded in the Company's stock while in possession of the MNPI described herein, reaping proceeds of nearly $266 million.

182.    As alleged above, Defendants Geisler and Grabowski are Xponential's fiduciaries, possessed MNPI from Xponential, and used that information to improperly profit from sales of Xponential stock. These defendants directed their stock sales set forth above due in whole or in part to their knowledge of the substance of the MNPI that they possessed.

183.    Defendants Geisler and Grabowski knew that the investing public was unaware of the negative material information that they possessed when they sold their Xponential stock. They also knew that, if the information were disclosed, the market price of Xponential stock would be significantly lower. These defendants timed their stock sales to take advantage of the public's ignorance of the concealed facts described herein and obtain a higher price for the stock they sold, thus benefitting by misappropriating the Company's confidential information.

184.    As a direct and proximate result of the misconduct of Defendants Geisler and Grabowski, Xponential has sustained significant damages, as alleged herein.

185.    Plaintiff, on behalf of Xponential, has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants

*for Unjust Enrichment*

186.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

187.     By their wrongful acts, violations of law, false and misleading statements, and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense and to the detriment of Xponential.

188.     The Individual Defendants either benefitted financially from the improper conduct, received unjust compensation tied to the false and misleading statements, received bonuses, stock options, or similar compensation from Xponential tied to the performance or artificially inflated valuation of Xponential, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct, or sold stock at artificially inflated prices during the Relevant Period.

189.     Moreover, Defendants Geisler and Grabowski unjustly enriched themselves by selling nearly $266 million of Xponential common stock, inflated as a result of the Company's issuance of the false and misleading statements described herein.

190.     Plaintiff, as a stockholder and a representative of Xponential, seeks restitution from the Director Defendants and seeks an order from this Court disgorging all profits— including benefits, performance-based, valuation-based, and other compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

191.     Plaintiff, on behalf of Xponential, has no adequate remedy at law.

## X.     PRAYER FOR RELIEF

**FOR THESE REASONS**, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

A.  Declaring that Plaintiff may maintain this action on behalf of Xponential, and that Plaintiff is an adequate representative of the Company;

B.  Finding that demand upon the Board concerning the wrongdoing complained of herein would have been futile;

C.  Declaring that the Individual Defendants have breached their fiduciary duties to Xponential;

D.  Finding that the Individual Defendants have been unjustly enriched;

E.  Determining and awarding to Xponential the damages sustained by it because of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre- and post-judgment interest thereon;

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

F.  Directing Xponential and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and protect Xponential and its stockholders from a repeat of the damaging events described herein;

G.  Awarding Xponential restitution from Individual Defendants;

H.  Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses and

I.  Granting such other and further relief as the Court may deem just and proper.

Dated: May 10, 2024                                        Respectfully submitted,

                                                          **LEVI & KORSINSKY, LLP**

                                                          By:  _____/s/ Adam M. Apton_____
                                                                ADAM M. APTON

                                                          445 South Figueroa Street, 31st Floor
                                                          Los Angeles, CA 90071
                                                          Telephone: (213) 985-7290
                                                          Facsimile: (212) 367-7171
                                                          aapton@zlk.com

                                                          **LEVI & KORSINSKY, LLP**
                                                          Gregory M. Nespole (*pro hac vice* forthcoming)
                                                          Daniel Tepper (*pro hac vice* forthcoming)
                                                          Correy A. Suk (*pro hac vice* forthcoming)
                                                          Sidharth Kakkar (*pro hac vice* forthcoming)
                                                          33 Whitehall Street, 17th Floor
                                                          New York, NY 10004
                                                          Telephone: (212) 363-7500
                                                          Facsimile: (212) 363-7171
                                                          gnespole@zlk.com
                                                          dtepper@zlk.com
                                                          csuk@zlk.com
                                                          skakkar@zlk.com

                                                          *Attorneys for Plaintiff*

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT